AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)      ☐ Original   ☐ Duplicate Original



LODGED
CLERK, U.S. DISTRICT COURT

06/21/2024

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ AP _____ DEPUTY

FILED
CLERK, U.S. DISTRICT COURT

06/21/24

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ KC _____ DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California

United States of America,

v.

MARCOS GUERRERO; ELIJAH GAFARE;
CINTHIA LEAL; and VINCENT SOLAREZ,

Defendants

Case No.   5:24-mj-00277

# CRIMINAL COMPLAINT BY TELEPHONE
# OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief. On or about the date of March 12, 2024 in the county of San Bernardino in the Central District of California, the defendants each violated Code Section 18 U.S.C. § 1951(a) (Interference with Commerce by Robbery and Conspiracy to do the same); and defendants GAFARE, GUERRERO, and LEAL also violated § 924(c)(1)(A) (i), (ii) (Possess, Use, Carry, and Brandish a Firearm in Furtherance of, and During and in Relation to,  Crimes of Violence).

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*/s/ Estevan Banuelos*
*Complainant's signature*

Estevan Banuelos  FBI SA
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   June 21, 2024

_____
*Judge's signature*

City and state:   Riverside, California

Hon. Sheri Pym, U.S. Magistrate Judge
*Printed name and title*

AUSA: Lisa J. Lindhorst (x6772)

## AFFIDAVIT

I, Estevan Banuelos, being duly sworn, declare and state as follows:

### I.   PURPOSE OF AFFIDAVIT

1.   This affidavit is made in support of a criminal complaint and arrest warrants against Vincent SOLAREZ ("SOLAREZ"), Marcos GUERRERO ("GUERRERO"), Cinthia LEAL ("LEAL") and Elijah GAFARE ("GAFARE") for violations of 18 U.S.C. § 1951(a) (interference with commerce by robbery or conspiracy to do the same); and against GUERRERO, LEAL, and GAFARE for violations of 18 U.S.C. § 924(c)(1)(A)(i) and (ii) (possess, use, carry, and brandish a firearm in furtherance of, and during and in relation to, crimes of violence) (collectively, the "Subject Offenses").

2.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and arrest warrants and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### II.   BACKGROUND OF AFFIANT

3.   I am a Special Agent ("SA") with the FBI and have been employed with the FBI since October 2019.  I have completed the

1

FBI 18-week training program, which includes instruction in investigating various criminal offenses governed by federal law. I have received training in the enforcement of the laws of the United States, including training in the preparation, presentation, service, and execution of criminal complaints and arrest and search warrants.

4.   I am currently assigned to the FBI Los Angeles Field Office, Riverside Resident Agency, where I am on the Inland Violent Crime Suppression Task Force ("IVCSTF") with an emphasis on violent offenses and fugitive apprehension.  This task force consists of experienced investigators from the FBI, Riverside Police Department, Riverside County Sheriff's Department, Fontana Police Department, San Bernardino Police Department, and the San Bernardino County Sheriff's Department.

5.   In connection with my employment with the FBI, I have participated in multiple investigations in which I have used a variety of investigative techniques, including interviewing suspects and witnesses, speaking with law enforcement agents and officers, conducting and reviewing electronic surveillance, executing arrest and search warrants, analyzing telephone records, and collecting and reviewing physical evidence.  From this experience and my conversations with other law enforcement personnel with substantial experience, I am familiar with the methods used by individuals engaging in armed robberies.

### III. SUMMARY OF PROBABLE CAUSE

6. On March 12, 2024, at approximately 3:00 a.m., the owners of an automobile repair shop in Bloomington, California, were robbed at gunpoint. This auto repair shop is also the residence for the two shop owners — a couple in their 60s. At the time of the armed robbery, the owners were both asleep in their bed. They awoke to three armed robbers – believed to be GUERRERO, GAFARE, and LEAL – forcing entry and then surrounding their bed, each armed with handguns. At the time of the robbery, GUERRERO had an open phone line with SOLAREZ, who I believe based on my investigation to have been serving as a lookout in his White BMW parked close by. Cell-site location data for both GUERRERO's and SOLAREZ's phones are consistent with them being near each other at the scene of the robbery.

7. After forcing entry and surrounding the victims with guns drawn, one suspect pistol-whipped the male victim at least twice in the back of the head so hard that the victim believes he lost consciousness. The laceration to the victim's head bled profusely and required medical treatment, including 10 staples. After pistol-whipping the victim, one of the suspects dragged the victim across the floor at gunpoint, towards the area that housed the auto-shop's office area. The suspects held both the male and female victim hostage at gunpoint for approximately an hour or more as they demanded their belongings.

8. The armed robbers ended up taking $4,000 cash from the male victim's pockets and $8,500 from the office desk. They also disconnected and stole the shop's DVR recording equipment,

3

which prevented law enforcement from recovering any footage of the robbery in progress.  Finally, they took the victims' car keys at gunpoint and then stole their car.

9.   Surveillance footage from two nearby buildings revealed two suspect cars – a light-colored GMC truck and a White BMW, which I believe based on this investigation to be owned by GUERRERO and SOLAREZ, respectively.  Video footage also revealed two male suspects on foot casing the front of the shop for an hour before the robbery began, who I believe based on their appearance in the video as well as call detail records and cell-site location data to be GAFARE and GUERRERO.

10.   Two weeks after the robbery, law enforcement recovered the victims' car just 100 yards from GUERRERO's residence.  LEAL was driving the car and had the keys in her possession.  SOLAREZ was in the front passenger seat of the car.  A search of LEAL's phone revealed videos of the area in front of the victims' shop taken just a few days before the robbery, consistent with her casing the shop.  Her phone's navigation application also showed that the victims' shop was a recently inputted location. Finally, LEAL was in contact with GUERRERO at the time of the robbery, and both of their cell-site location data is consistent with them being near the robbery at the time of the robbery.

11.   Additional cell-site location data reveals that SOLAREZ was in contact with both GAFARE and GUERRERO at the time of the robbery and that SOLAREZ's device was pinging off the same towers as GUERRERO and LEAL, consistent with all three being at the scene of the robbery.  Law enforcement has

requested and is still waiting to obtain GAFARE's location data, but call detail records confirm that he was in frequent contact with both GUERRERO and SOLAREZ at the time of the robbery. Further, GAFARE is consistent in appearance to one of the suspects captured on surveillance video casing the shop before the robbery. GAFARE is also an associate of SOLAREZ and GUERRERO, as he had a photo on his Facebook account of the three of them together. Finally, GAFARE referenced in a Facebook message days after the robbery that he had "pulled a few licks" (i.e. stolen large sums of cash) to get through the month.

12. Search warrants were executed at the homes of both GAFARE and GUERRERRO. Both suspects fled as soon as law enforcement arrived. In GUERRERO's bedroom, law enforcement recovered a taurus semiautomatic pistol, three magazines, and more than 50 rounds of ammunition.

13. In GAFARE, LEAL, SOLAREZ and GUERRERO's custodial interviews, they all denied knowing any of their accomplices (which is inconsistent with their call detail records). GAFARE, SOLAREZ and GUERRERO denied any involvement in the robbery, but LEAL admitted to being present and stated she was just there to translate.

14. Finally, after his arrest and while he was in jail, GUERRERO called associates, including SOLAREZ and another individual. In those calls, he discussed the robbery, admitted that it was him in a screenshot from surveillance, made coded threats to retaliate against the victims for calling 911, and

asked whether law enforcement had found his "dickies" or "levis" because that is what he was wearing.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

15.   Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

### A.   **Victim Interviewed at the Hospital after his Head Lacerations are Stapled**

16.   At approximately 11:02 a.m. on March 12, 2024, Medical personnel at Kaiser Hospital in Fontana, California called 911 after learning that a 60-year-old patient's large head laceration had been caused by an armed robber striking him so hard with a pistol that he lost consciousness.  San Bernardino County Sheriff's Department ("SBCSD") deputies responded and spoke with medical staff, who relayed that the victim suffered two lacerations to the back of his head, one of which required ten staples.

17.   SBCSD Deputies then spoke to the victim of this alleged armed robbery.  According to the deputies' reports, the victim explained that both he and his wife had been robbed at gunpoint while they were asleep earlier that morning.  The two victims, a married male and female couple, co-own an auto-repair shop located in Bloomington, California, where the robbery took place.  They also reside in the shop.  The husband ("Victim-1") explained to law enforcement in Spanish that three armed robbers broke into the repair shop early that morning.  Victim-1 was in bed with his wife ("Victim-2") at the time.  Victim-1 heard a

loud noise as the suspects forced open the front door.  The suspects rapidly entered the victims' bedroom and surrounded the bed, each of them holding a black handgun.

18.   Victim-1 did not know or recognize any of the suspects, but he described them to law enforcement.  He described the first suspect as possibly being a black male with dark complexion and a tall thin build, wearing a ski mask, black sunglasses, gray pants and a dark hooded sweatshirt, who appeared not to understand Spanish ("Suspect-1").  As explained much more detail below, I believe based on my investigation that Suspect-1 is GUERRERO, who is a tall, thin, 190lb dark-skinned Hispanic male (he goes by the moniker "negro" – which translates "black" - on his jail calls, and he has that word tattooed on his body).

19.   Victim-1 described the second suspect as an adult male, unknown race, wearing a ski mask and a black hooded sweatshirt ("Suspect-2").  As explained in much more detail below, I believe based on my investigation that Suspect-2 is GAFARE, who I know to be a 6'2, 200lb light-skinned Hispanic male.

20.   Victim-1 described the third suspect as a Hispanic female adult, 5'4", fair skin, short dark curly hair, wearing a ski mask and a white hooded sweatshirt with gray pants ("Suspect-3").  As explained in much more detail below, I believe based on my investigation that Suspect-3 is LEAL, who I know to be a 5'4" Hispanic female with short light-brown curly hair, who was found two weeks later driving the victims' car,

7

and who admitted to law enforcement to being present during the
robbery.

21.  Victim-1 also described the way in which the robbery
occurred.  Specifically, he explained that while he and his wife
were lying in bed and soon after he heard the loud thump near
the front door, Victim-1 was hit hard in the back of the head
with a pistol.  Victim-1 believes he lost consciousness.  He
recalls being surrounded by three suspects.  While lying on the
ground after being struck in the back of the head, one of the
suspects dragged him across the floor and out of the bedroom
towards the main entrance.  Suspect-1 yelled while pointing his
gun at Victim-1 and Suspect-1 sat him on a chair next to his
desk and demanded money from him.  Victim-1 responded in
Spanish, which neither of the male suspects appeared to
understand, so Suspect-3 translated for them.  Suspect-1 also
demanded Victim-1's car keys, and Suspect-1 threatened to kill
Victim-1 if Victim-1 called the police (note: as described
further below, in subsequent jail calls, GUERRERO made a coded
threat based on his belief that the victim did in fact call
authorities).

22.  Victim-1 reported that the suspects took $4,000 from
Victim-1's pants pocket, took $8,500 from the desk, took his car
keys, and took the shop's installed DVR camera system.  Victim-1
confirmed that the suspects also stole their car – a 2011
Chevrolet Silverado bearing license plate CA ****0F1.  And he
confirmed that the suspects arrived in their own car, which was
a gray truck.

23.   Victim-1 explained to SBCSD Deputies that because the suspects threatened to kill Victim-1 if he called the police, Victim-1 did not try to call the police.  Because the victims' car was stolen, they did not immediately go to the hospital. Victim-2 photographed Victim-1 immediately after the robbery, and the photographs show Victim-1 with blood running down his head.

 

24.   Victim-1 later called a friend ("Witness-1") and asked Witness-1 to come over.  Witness-1 arrived at the shop at approximately 10:30 a.m. and then drove both victims to the hospital.  Witness-1 spoke to law enforcement at the hospital and stated that when he arrived at the victims' home that morning, Victim-1 appeared to be in shock and was too scared to call 911.

**B.   Law Enforcement Canvasses the Scene for Evidence**

25.   After interviewing the victims and Witness-1 at the hospital, SBCSD Deputies responded to the scene of the robbery

(the auto-repair shop).  The building the robbers broke into housed the repair shop's office as well as the shop owner's one-bedroom apartment.  This repair shop sat behind a large sign bearing the business name and logo. The front door faced the street.  The shop shared a parking lot filled with cars with a neighboring business.

26.  Deputies saw damage to the repair shop's front door bolt and frame, consistent with the door being kicked in. Deputies also saw evidence of the car-repair shop's DVR camera system had been tampered with and disconnected.  Specifically, the screens that would display the footage were still there and the wires that used to connect the screen to the DVR cameras were still there, but the DVR recorder was gone and the wires appeared to have been disconnected, consistent with the robbers having stolen the DVR recorder.

27.  Neither fingerprinting nor DNA swabs were done at the scene, in part because Victim-1 recalled that the main suspect wore gloves.

**C.  Video Footage from Nearby Businesses Shows Two of the Suspects**

28.  Because the suspects stole the auto shop's video surveillance system, SBCSD Detectives attempted to collect footage from surrounding businesses.  Detective C. first obtained video footage from a business that sits next door just east of the incident location, and the two locations share a parking lot.  One surveillance camera captures the parking lot to the east of the incident location but does not reveal the

incident location's entry door.  Another surveillance camera faces north and captures the neighboring business's parking lot east of the incident location and the apartment complex north of the incident location.  The lead detective ("Detective D.P.") also obtained video footage from an apartment across the street. Video from this angle depicts the primary street just east of the incident location.

29.  Note that the neighboring business's footage was approximately 12 hours slow such that time stamp of 3:05 p.m. on March 11, 2024, corresponded to a true time of approximately 3:05 a.m. on March 12, 2024 (though I am approximating because I am unsure at this time whether the difference was exactly 12 hours).

30. The footage from one surveillance camera revealed that at timestamp 15:05 (approximately 3:05 a.m. real time on March 12, 2024), one male consistent with Suspect-1 appeared to case (that is, to walk around the area seemingly inspecting the area) the incident location.  He walked from the primary street directly into the neighboring business's parking lot, he looked west towards the shop then walked back towards the primary street and out of view.  Although nighttime with limited lighting, Suspect-1 appeared to be tall and dark-skinned and thin with a dark hooded sweatshirt with the hood up. Approximately fifteen minutes later, the individuals I believe to be Suspects 1 and 2 walked back into the frame towards the same location.  I believe Suspect-1 to be the male on the left in a dark Navy sweatshirt and Suspect-2 to be the individual on

11

the right in a black sweatshirt.  As to Suspect-2 specifically, his height and weight relative to GUERRERO is consistent with GAFARE's height and weight.  Additionally, Detective D.P. reviewed GAFARE's Facebook account and saw images where he wears similar style hats in the same manner as shown here, with the peak raised slightly off the front of his forehead.



31.  Both suspects remained in this parking lot, where they loitered for almost an hour from approximately timestamp 15:15 to 16:15 (actual time 3:15 – 4:15 a.m. on March 12, 2024).

32.  At 15:20 on the video (3:20 a.m. actual) both suspects appear to use cellphones.  The first suspect looked down at his phone in his hand; the second suspect held his cellphone to his

ear while appearing to speak.  As described further below, call
detail records for GUERRERO and GAFARE show that they were
separately communicating with SOLAREZ on their devices at these
approximate times.

33.  The cameras also captured the suspect cars and the
victims' car at various points.  At approximately 4:21 a.m., an
unidentified individual drove what we later learned was one of
the suspect's cars (a light-colored full-sized GMC truck) east
on the primary street, then the driver pulled over and turned
off the headlights before reversing up towards the auto-repair
shop's entrance.  At approximately the same time it can be seen
on video that someone had moved the victims' car (a silver
Chevrolet Silverado) from the area of the shop.  The victims
reported that before the robbery their car was parked in front
of the shop.  I saw on video, however, that shortly after 4:00
a.m., the victims' car had been relocated and parked down the
street, near where the suspect's GMC was parked.  Then, at
approximately 5:00 a.m., the victims' car could be seen
reversing out on the primary street and then driving east away
from the location, followed closely by the suspect GMC.  Then,
approximately 10 seconds later, a White BMW (consistent with
SOLAREZ's White BMW) pulled away from north curb line, did a U-
turn, and followed the other two cars east down the primary
street.

34.  Due to the limited angles, the cameras did not capture
any suspects entering or exiting any of these three cars, but
the cameras do clearly capture the makes and models of the

13

vehicles.  The footage that I have reviewed also does not show the incident location's entry door, nor does it capture the other two suspects (LEAL or SOLAREZ).

### D.   GUERRERO Owns the Suspect GMC Truck

35.   Later in the investigation, law enforcement ran a criminal history check on GUERRERO.  That search revealed that during a 2023 felony drug case, GUERRERO was arrested while driving a truck that appeared to match the suspect vehicle in this case: a light-colored 2005 GMC truck.  The plate affixed to the Truck at the time was CA ending in 2S2.  An LPR query of that plate revealed a truck consistent with the suspect truck. Then on May 28, 2024, Detective D.P. conducted surveillance at GUERRERO's known address on Foothill Boulevard in Glendora, and the same truck was parked outside.  Based on Detective D.P.'s review of surveillance from the scene of the incident, and his analysis of GUERRERO's truck from surveilling it in person, he believes based on the make, model, size, color, wheels and various other features, that GUERRERO's truck is the truck captured in surveillance footage of the robbery discussed herein.

### E.   Two Weeks After the Robbery, LEAL and SOLAREZ are Inside the Victims' Stolen Car, and LEAL's Cellphone Links Her to GUERRERO and the Robbery Location

36.   On March 26, 2024 (two weeks after the robbery), Glendora Police Officers alerted Detective P.D. that they found the victims' car – which Detective P.D. had notified other law enforcement as having been stolen - at the intersection of Lorrain Drive and Foothill Boulevard in Glendora, California and

14

had detained two suspects – a male and a female - who were seen exiting and walking away from the victims' car.  Detectives soon learned that the suspects were LEAL and SOLAREZ, and that this location was just 100 yards from the home of GUERRERO.

37.  Detectives first spoke with LEAL, the alleged driver of the victims' car.  She identified herself as Cinthia LEAL with a home address in Ontario, California.  LEAL appeared consistent with the description Victim-1 provided for Suspect-3: She is a 5'4" Latina with fair skin and short curly light-brown hair.  LEAL had the victims' car keys in her possession.  LEAL was read her rights and she waived them, and then claimed to have borrowed the car from "Daniella" but provided no further identifying information about Daniella.  LEAL also denied knowing SOLAREZ, despite Glendora police seeing them together exiting the victims' car.  LEAL was arrested on scene for driving a stolen vehicle and SBCSD Deputies wrote a search warrant for a forensic examination of her phone's contents, as described below.  That search revealed multiple phone calls between LEAL and SOLAREZ in February and March of 2024 (before and after the robbery).

38.  Detectives next spoke with SOLAREZ.  He self-identified as Vincent SOLAREZ.  SOLAREZ did not appear to match the description of either of the two male suspects that were inside the victims' home at the time of the robbery.  He is neither tall nor thin – he is approximately 5'6" and 240 lbs.  SOLAREZ declined to speak with law enforcement.

39.  After arresting both LEAL and SOLAREZ, detectives obtained a state court search warrant for the contents and the cell-site location data from LEAL's phone.  Through that search, Detective D.P. saw that in LEAL's navigation application shows that a recently-inputted address was the victims' car-repair shop.  LEAL's phone also contained two videos taken right outside the incident location, one on March 7, 2024 and the other on March 8, 2024 (just 4 and 5 days before the robbery), and the video depicted the area in front of the shop where the two male suspects stood loitering before the robbery took place. In that video, LEAL walked the same route that Suspects 1 and 2 walked from the primary street towards the victims' shop entrance.

40.  LEAL also had in her phone several phone numbers associated with GUERRERO, one number of which she called during the robbery, at 3:25 a.m. on March 12, 2024.  That phone number ***-***-8309 was saved as "Mi Amor Lindo."  She called that number at 3:25 a.m. on March 12, 2024, which is when the robbery was in progress.  At that time, her device pinged off one of the two towers closest to the incident (18829 Valley Blvd., which is 1.0 mile from the incident), consistent with her being in the area of the robbery at the time that it happened.

**F.   Call-Detail Records and Cell-Site Location Data Shows Suspects in Frequent Contact and Near the Robbery Location**

41.  Pursuant to a state court search warrant, Detectives obtained call detail records for GUERRERO's 8309 number, which revealed that he had multiple calls with two phone numbers

around the time of the robbery which the investigation revealed belonged to SOLAREZ and GAFARE.  Detectives obtained another state court warrant for the cell-site location information for those two numbers.  The data for GAFARE is still pending, but the data for GUERRERO and SOLAREZ revealed that both devices were in the area of the incident at the time of the incident.

42.  Specifically, GUERRERO's device had six phone calls with phone number ***-***-9253 between 2:00 a.m. and 5:45 a.m. on the morning of the incident (an hour before the home invasion began and up to approximately 45 minutes afterwards).  Law enforcement databases reveal that the number is used by GAFARE (i.e. Suspect-2), who at the time of the robbery was on post-sentence supervision and had provided that number to his probation officer.  As mentioned above, law enforcement has requested but has not yet received cell-site location data for GAFARE.  Toll records, which we have received, show that GAFARE and GUERRERO were not commonly in frequent contact generally, but their calls were noticeably more frequent in the hours surrounding the robbery.

43.  During that same time window, GUERRERO's phone had 9 phone calls with number ***-***-5936, which law enforcement knows to be VINCENT SOLAREZ's number – the same suspect who was seen exiting the front passenger seat of the victims' stolen car just two weeks after the incident.  Detective D.P. personally spoke with SOLAREZ on that number on June 4, 2024.  Cell-site location data revealed that SOLAREZ's device pinged off the same two towers closest to the incident location throughout the

17

relevant time period.  Specifically, his device utilized the
tower at 17760 W Valley Blvd. (0.5 miles away from the incident)
and 18829 Valley Blvd. (1.0 mile from the incident).  SOLAREZ's
location data also shows his device in the area of his home in
Upland, California between 1:00 and 2:00 a.m., and then moving
towards the area of the incident where it remained from
approximately 2:00 a.m. to approximately 5:00 a.m., after which
the device moved back towards SOLAREZ's home in Upland.  Lastly,
SOLAREZ's device also called GAFARE's device at approximately
the same time as Suspects-1 and 2 appeared on video, before the
robbery.

44.  Note that although SOLAREZ is not captured on video
the night of the robbery, nor does he match the description of
the suspects that entered the residence, I believe based on my
investigation that SOLAREZ served as a lookout.  SOLAREZ
admitted to law enforcement on June 4, 2024, to owning and
driving a White BMW, and footage reveals that a White BMW
followed the suspects closely immediately after they departed
the scene, which is consistent with SOLAREZ's cell-site
information.  Also, an Automatic License Plate Reader revealed
that no White BMW was parked near SOLAREZ's home between 2:00
a.m. and 5:00 a.m. on March 12, 2024, but that a White BMW was
back in that location shortly after the robbery, at 5:24 a.m.
Specifically, cameras from the automatic license plate reader
shows a White BMW leaving the area in Ontario where SOLAREZ
lived at approximately 1:34 a.m.  His cell-cell location data
shows his phone moving towards the robbery location at that

time.  His phone stayed in the area of the robbery location
until 5:00 a.m., after which a license plate reader captured a
White BMW returning to Upland, in the direction of SOLAREZ's
home in Ontario, consistent with his location data, which shows
his phone back in the area of his house by 5:28 a.m. SOLAREZ was
also on the phone with GUERRERO for over 2,000 seconds (over
three hours) during the robbery, which based on my training and
experience is consistent with him having an open line as the
lookout to communicate to GUERRERO if anything was happening
outside. SOLAREZ was also found in the victims' car with LEAL
two weeks after the robbery, SOLAREZ lied to law enforcement
about knowing any of the other suspects, and he discussed the
robbery with GUERRERO in jail calls several times, as discussed
below.

45.  In summary, the call-detail records and the location
data from the devices associated with GUERRERO, LEAL, and
SOLAREZ is consistent with them all leaving their respective
homes, travelling at approximately the same time to the incident
location, then remaining in that area together, and then moving
back towards their respective homes after the robbery.  And
although we do not yet have GAFARE's cell-site data, I believe
he was the second male suspect who entered the victims' shop
that day in part because GAFARE was in communication with
GUERRERO throughout the relevant time period and because GAFARE
is consistent in appearance to Suspect-2 from the surveillance
video.

### G.   Additional Links to GAFARE

46.   In an effort to identify further associations between GUERRERO, GAFARE and SOLAREZ, beyond the phone calls identified above, Detective D.P. did a social media inquiry.  Detective D.P. found a publicly viewable Facebook account in the name Elijah GAFARE.  The images on that account appeared to be the same GAFARE discussed above, based on a comparison of his booking photos.  On GAFARE's Facebook account, he had a publicly viewable photograph that I recognized to depict GUERRERO, GAFARE, and SOLAREZ together on November 8, 2023 (four months before the incident).  Detective D.P. identified each of the three males based on his familiarity with their appearance through this investigation, through meeting them in person, and through viewing their prior booking photographs. Specifically, GAFARE has distinct ears that stick out more than average and he is taller than GUERRERO, and their hair and skin tone is distinct, with GUERRERO being darker and bald.



47.   Detective D.P. then obtained a state court search warrant for GAFARE's Facebook Account.  A search of that account revealed a Facebook messenger thread in which he said, a few days after the robbery, to an associate that financial times were difficult that month, and that he had to "pull a few licks" to get by.  In my training and experience, to "pull a lick" is slang for stealing significant amounts of cash.

48.  Law enforcement learned that GAFARE has a prior conviction that proved relevant to the investigation: An armed robbery from 2021 where, similar to here, he held victims at gunpoint against their will approximately 25 minutes while demanding cash and other items.

**H.  GUERRERO and GAFARE's Residential Search Warrants And Flight**

49.  On May 30, 2024, Detective D.P. participated in the execution of state court search warrants at the homes of GUERRERO and GAFARE.

50.  The first warrant was executed at GUERRERO's residence in Glendora.  GUERRERO's home is a two-bedroom, which he lives in with his girlfriend.  They share a bedroom, and the second room is used as the girlfriend's art studio.  When law enforcement arrived, GUERRERO was home, and he immediately tried to flee out of the back door.  Deputies caught and detained him. Suspect LEAL was also present at the time, and based on my investigation, including the fact that she had him saved in her phone as "Mi Amor," I believe she is in a romantic relationship with GUERRERO (though she is not his live-in girlfriend).

51.  In the bedroom that GUERRERO shares with his girlfriend, deputies found a black and silver Taurus semi-automatic pistol serial number NAP78197, loaded with a black magazine containing 11 rounds of live .45 caliber ammunition. The pistol and magazine were on the top shelf of a closet that contained both his and his girlfriends' clothing.  Under their shared bed, law enforcement recovered two additional magazines containing 9mm ammunition, one of which was an extended magazine.  They also recovered 54 rounds of assorted 9mm, .45 caliber, and .38 caliber bullets, $470 in cash, and mail and a social security card in GUERRERO's name.



52.    Later that same day, deputies executed a search warrant at GAFARE's home in West Covina, California.  He too fled on foot but was detained approximately six houses away. Deputies recovered no relevant evidence while searching his home.

53.    After executing these search warrants, GAFARE, LEAL and GUERRERO were all arrested and booked for their involvement in the March 12 robbery and were advised of their <u>Miranda</u> rights.  LEAL waived her rights and agreed to talk.  When asked about her involvement in the robbery, she admitted to being there and said something to the effect of, "they just wanted me to translate."  When the detective asked who "they" were, LEAL claimed not to know their names.  LEAL also claimed not to remember what she translated.  After GUERRERO and GAFARE were

advised (in separate rooms) of their rights, they both denied
any knowledge of or involvement in the robbery.

54. SOLAREZ was not arrested until approximately 5 days
later, on June 4, 2024. Upon his arrest, SOLAREZ similarly
denied any knowledge or involvement in the robbery and denied
knowing GUERRERO, LEAL, or GAFARE (despite, as explained next,
having several jail calls with GUERRERO).

**I. GUERRERO's Incriminating and Threatening Jail Calls**

55. Detective D.P. monitored jail calls made by GUERRERO
and GAFARE after their arrests (and before SOLAREZ's arrest),
all of which were recorded. On May 31, 2024, the day after his
arrest, GUERRERO called SOLAREZ using another inmate's account.
Detective D.P. knew it to be GUERRERO because GUERRERO explained
on the call why he was using another account (his account was
not working) and Detective D.P. recognized his voice. During
that call, SOLAREZ told GUERRERO that a woman (who he identified
by her full name but who I refer to herein as "S.H.") was trying
to send money to his and LEAL's inmate accounts (he referred to
LEAL by her first name, Cinthia). GUERERRO also told SOLAREZ on
a jail call that "they showed me a picture of me and another
guy," which was a seeming reference to his custodial interview
when Detective D.P. showed GUERRERO the screen shot included
above of Suspects-1 and 2 on scene shortly before the robbery.

56. GUERRERO also called S.H. from his own inmate account
and during that call, S.H. read him the list of items to be
seized printed on his residential search warrant. GUERRERO
asked S.H. to check whether his "Levies" and "Dickies" are there

"cause those are the things I was fucking… whatever… you know?"
I believe this to be a reference to GUERRERO's concern that law
enforcement might find clothing at his residence that he had
been wearing during the robbery.  I note that due to the quality
level of the surveillance footage I reviewed, I was not able to
determine whether either suspect wore Dickies or Levi's pants.

57.  GUERRERO spoke to S.H. and SOLAREZ again on June 3,
2024, this time stating what I believe in my training and
experience to be both a threat to confront the robbery victims
in retaliation for them calling the authorities and a warning to
keep LEAL in line and prevent her from speaking to authorities.
Specifically, GUERRERO read to SOLAREZ and S.H. a news article
about his arrest and emphasized the part that reported that the
robbery victims had called 911.  [Note: This was in fact a
misreport, as it was hospital staff who called 911, not the
victims.]  GUERRERO then said, "the main point is this, ok, the
victims called the authorities and the deputies from the Fontana
Sheriff's Station began their investigation. So that's where I'm
at all the way around. So that's what's up."  GUERRERO then
pivoted and asked about LEAL's whereabouts and emphasized that
they need to support her because she is "a little bit weak" and
"you know what happens if they start thinking stupid, they start
doing stuff . . . we gotta make sure that she's… everything is
everything."  I understood, based on my training and experience,
that this was an instruction to SOLAREZ to keep LEAL in line and
to prevent her from talking to authorities.  GUERRERO then
appeared to return to the topic of the robbery victims and said,

"were you able to see the clown and fuckin go to the circus?"
SOLAREZ replied, "no, but it will happen tomorrow," to which
GUERRERO said "you can't believe what the paper is saying… you
can't believe that but … its saying somebody called from within
and said something…. So that's directly on him. Tell him I said
that and we'll go from there."

58.   Based on my training and experience paired with the
context in this case, I believe that the statement "were you
able to see the clown and go to the circus" may have been a
directive to confront the victims for calling 911.  Note
however, that on June 4, 2024, the day after this phone call,
law enforcement checked on the victims and they had not received
any contacts, threatening or otherwise, about the robbery.  I
nonetheless believe this may have been a directive to confront
and retaliate against the victims in part because the armed
suspects threatened to kill the victims in retaliation if they
called the authorities.  GUERRERO also self-identified as a
member of the Los Olivos street gang and as an associate of the
Mexican Mafia.  I know based on training and experience that
Hispanic gangs in Southern California do, as a practice,
retaliate against those who cooperate with law enforcement.
Detective D.P. also believes this wording to be a directive to
confront and retaliate against the victims based on his
extensive work over three years on a jail intel team.  During
that time, Detective D.P. heard numerous jail-calls involving
southern Hispanic gangs and the use of coded language is common
when attempting to conceal illegal activity because they know

the calls are recorded, all of which were done using coded
language similar to what GUERRERO did here.

**J.  Additional Information**

59.  On June 4, 2024, law enforcement showed photos to
Victim-1 of the three suspects in custody, LEAL, GUERRERO, and
GAFARE, and shared with Victim-1 their phone numbers.  Victim-1
did not recognize any of the suspects and he did not recognize
their numbers or have them in his phone.  Note, however, that
Victim-1 was in shock and suffering from a head injury at the
time, and the suspects were wearing hoodies and ski masks during
the robbery, and Suspect-1 (who I believe to be GUERRERO) wore
sunglasses as well.

60.  After the robbery, Detective D.P. queried Automatic
License Plate Reader for vehicles that match the suspect
vehicle's description: A light colored Chevrolet GMC truck with
lifted suspension, black wheels, offroad tires, black bed cover,
and silver step bars under the doors.  Deputies found what
appeared at first to be the same vehicle with a California auto
dealer plate DLR *****1A, but it was not the suspect car. DMV
records revealed the registered owner to be an individual whose
identity is known to law enforcement ("Person-1").  Law
enforcement obtained Person-1's address and phone number.
Outside that address, law enforcement found his GMC truck.  Upon
closer inspection the truck was noticeably smaller and darker
than the suspect vehicle.  Detective D.P. also obtained a state
court search warrant for Person-1's cell-site location data,

which revealed that at the time of the home invasion, Person-1 was not at the scene of the incident.

61.   While law enforcement secured the perimeter before executing the search warrant at GUERRERO's home in Glendora on May 30, 2024, an individual later identified as GUERRERO's brother ("Person-2") drove onto the property in a silver 2014 Chevrolet Malibu.  Upon seeing law enforcement, he promptly fled on foot but was detained nearby.  A subsequent search of the vehicle he was driving revealed a loaded semi-automatic Glock handgun underneath the front passenger seat.

62.   GUERRERO contacted one additional phone number during the relevant time period of the robbery – a number ending in 4623.  He only called that number twice and the number was not associated with any suspects in law enforcement databases.  Accordingly, no cell-site location data was obtained for that device.

### K.   Interstate Commerce Nexus

63.   The victims' auto-repair shop is a licensed and registered automotive repair facility located in Bloomington, California, the inventory of which travels in interstate commerce.  I have verified with Victim-1, the registered owner of the auto-repair shop, that the facility obtains, as a regular course of business, auto parts that were manufactured outside California and shipped from states outside California.

### V.   CONCLUSION

64.   For all of the reasons described above, there is probable cause to believe that LEAL, GUERRERO, SOLAREZ and

GAFARE violated 18 U.S.C. § 1951(a) and that LEAL, GUERRERO, and

GAFARE violated 18 U.S.C. § 924(c).


Attested to by the applicant in
accordance with the requirements of
Fed. R. Crim. P. 4.1 by telephone on
this 21st day of June, 2024.

_____
HON. SHERI PYM
UNITED STATES MAGISTRATE JUDGE